IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 28, 2014

**KENNETH R. GRIFFIN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Washington County**
**No. 26850     Jerry R. Beck, Judge**

**No. E2013-00617-CCA-R3-PC - Filed March 5, 2014**

Kenneth R. Griffin ("the Petitioner") was convicted of first degree murder and especially aggravated robbery. The Petitioner subsequently filed for post-conviction relief, alleging ineffective assistance of counsel. Following a hearing, the post-conviction court denied relief. The Petitioner now appeals. Upon our thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Clifton Corker, Johnson City, Tennessee, for the appellant, Kenneth R. Griffin.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Tony Clark, District Attorney General; and Kenneth C. Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Washington County jury convicted the Petitioner of first degree murder and especially aggravated robbery. The Petitioner waived his right for a jury determination of his sentence and accepted a sentence of life without the possibility of parole for his first

degree murder conviction by agreement with the State.[1]  The trial court sentenced the Petitioner to twenty-three years' incarceration for his especially aggravated robbery conviction, to be served consecutively to his first degree murder sentence.  On direct appeal, this Court affirmed the judgments of the trial court.  See State v. Kenneth R. Griffin, No. E1998-00037-CCA-R3-CD, 2000 WL 944010, at *8 (Tenn. Crim. App. July 6, 2000), perm. app. denied (Tenn. Feb. 20, 2001).  To assist in the resolution of this proceeding, we repeat here the summary of the relevant facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

> On August 4, 1995, the victim, K.D. Norris, failed to open his barber shop, which was located at his residence in the Boone's Creek area of Washington County.  Concerned family members contacted the sheriff's department and Sergeant Daniel Rhudy was called to the scene.  Officers searched the barber shop and connecting residence but found nothing.  A member of the victim's family suggested a search of the garage which the defendant had been employed to construct.  Sergeant Rhudy and Lieutenant Edward Graybeal found the body.  The victim was lying face down, hands tied behind his back, in a pool of blood.  Dr. William McCormick, a forensic pathologist, investigated the scene and later performed an autopsy.  He determined that a stab wound to the neck, which severed the jugular vein, was the cause of death.  Dr. McCormick also found "a good bit of blunt force damage, a number of stab wounds, a missing tooth, broken ribs, and a broken collar bone."  He concluded that the victim had been "strung up" or "hung" by what appeared to be a cloth curtain and that, in consequence, the bones in his neck had been crushed.  Dr. McCormick estimated that the injuries had been inflicted over a period of one to two hours and that the victim died sometime between 6:00 P.M. on August 3 and 8:00 A.M. on August 4.
>
> Larry Mullins, the victim's first cousin, had last seen the victim on Sunday, July 30.  Mullins confirmed that at that time the victim had displayed a large amount of cash in his wallet, including an inch or two of one hundred dollar bills.  The victim also had a three-inch stack of bills of unknown denominations in his front pants pocket.  Mullins was aware that the victim had complained about poor workmanship by [the Petitioner] and intended to employ another contractor to correct his work.  The victim had also indicated to Mullins that he planned to employ an attorney in regard to the construction problems.

---

[1] The State originally was seeking the death penalty in this case.

Estelle McKinney, a close friend of the victim, confirmed that the victim often carried large sums of cash and that the victim had been displeased with the quality of construction on the garage. She had last talked with the victim between 8:00 and 9:00 P.M. on August 3. Ms. McKinney recalled that at the time, [the Petitioner] was working on the garage and the victim, in contrast to his earlier remarks, expressed satisfaction with the construction.

On the day the body was found, TBI Agent Shannon Morton questioned [the Petitioner]. [The Petitioner] contended that he had worked on the victim's garage from 5:00 P.M. to between 8:00 and 9:00 P.M. He claimed that he had been wearing shorts, a black shirt, and "flip-flops" while working on the garage. [The Petitioner] asserted that he had been repairing the motion sensor light. He stated that he returned to his home at 10:00 P.M.

Agent Morton had determined that the sensor light was not operable when he investigated the crime scene. Thus, two days after the initial interview, Agent Morton conducted a second interrogation. During questioning, he recovered $624.00 in cash from [the Petitioner], including a blood-stained fifty-dollar bill. Agent Morton discovered a cut on one of [the Petitioner's] hands which had been bandaged. A witness stated that [the Petitioner] did not have this injury the day before the murder.

Officer Dennis Higgins, who conducted a search of [the Petitioner's] vehicle, recovered $13,800.00 in one hundred dollar bills. The bills were wrapped by a large red rubber band similar in nature to those contained in a bag of rubber bands recovered at the crime scene. Officer Higgins also found a pair of tennis shoes belonging to Ferrell Routh. It was established that at 10:00 P.M. on August 3, [the Petitioner], who was wearing pants and boots rather than shorts and "flip-flops," as he had earlier alleged, paid his rent in cash.

TBI Special Agent Samera Zavaro determined that the stain on the fifty-dollar bill was human blood. A DNA analysis was impossible due to the small size of the sample. A blood stain was also found on one of the boots recovered from [the Petitioner]. TBI forensic scientist and shoe print expert Linda Littlejohn compared the sole of the boot with bloody shoe prints at the crime scene. Agent Littlejohn concluded that the sole of [the Petitioner's] boot was the same size, shape, and tread design as the bloody prints. Agent Littlejohn, who had examined thousands of shoes, testified at trial that [the Petitioner's] boot, size 15, was the largest she had ever analyzed.

Agent Morton determined that [the Petitioner] made a number of small purchases within a few days after the murder, including payment of a late cable television invoice, payment for an upgrade of cable service, and gifts for himself and his girlfriend, Rhonda Morton (apparently no relation to Agent Morton), with whom [the Petitioner] resided at the time of the murder. The estimated amount of his total payments and purchases was $1,175.00. Ms. Morton testified that she had never known [the Petitioner] to have large sums of cash in his possession. Furthermore, it was established that on August 3, the day of the murder, [the Petitioner] had pawned a Makita Sawsall saw. On the next day, [the Petitioner] paid off the loan, including 30 days of interest, and retrieved the saw.

Donald Harry Urich, Jr., who shared a cell with [the Petitioner] during the period between his arrest and the trial, testified for the [S]tate. Urich maintained that [the Petitioner] confessed to having conspired with Ferrell Routh, a former employee, to kill the victim. According to Urich, [the Petitioner] related several details of the murder. He contended that [the Petitioner] acknowledged his involvement but asserted that Routh actually committed the crime.

James David Strickler, who had several prior drug and theft-related offenses, testified that he worked for [the Petitioner] on the victim's garage for five days. He claimed that he saw [the Petitioner's] vehicle at the victim's residence at 3:30 P.M. on August 3 and again at 4:30 P.M.

Bea Bennett testified for the defense. She claimed that between 5:00 and 5:30 P.M. on August 3, she saw Strickler's vehicle parked at the victim's barber shop. She stated that she reported what she had seen to a representative of the sheriff's department who said they had "chose the other guy." Ms. Bennett testified that she told the officer that she "didn't believe the guy was the only one . . . ." She stated that she did not see [the Petitioner] at the time she saw Strickler.

Lori Stevens, Strickler's former girlfriend, also testified for the defense. She recalled that Strickler had told her shortly after the murder that he was "pretty upset" about the murder and "was nervous because he was getting drug in it." Ms. Stevens contended that Strickler said he was "afraid that he was going to get in trouble . . . because of Ferrell Routh." She recalled that Strickler admitted having $3,500.00 in his possession that had "come out of the garage." Ms. Stevens, who was serving time on a burglary conviction and

-4-

other small offenses, conceded on cross-examination that Strickler said that he had left the garage "before it got too bad."

Routh was also called as a defense witness. He denied having been at the victim's residence on the date of the murder and stated that he saw Strickler at his apartment in Johnson City between 6:00 and 7:00 P.M. Routh denied killing the victim. Routh recalled that [the Petitioner], sometime before the murder, had mentioned that the victim kept a briefcase containing a large sum of money. Telephone records indicated that Routh received long-distance calls at 7:40 P.M. and 10:26 P.M. at his apartment in Bluff City on the night of the murder.

Charles Richardson, an inmate in the Washington County Jail, also testified for the defense. He testified that some eight months after the murder, Routh admitted killing the victim. When interviewed by police, Richardson stated that he didn't know whether Routh was joking about the murder or not. Richardson did not learn any details about the murder, including whether anyone else might have been involved. At the time of the conversation, Richardson was smoking marijuana and was drinking with Routh. At the time of his testimony, Richardson was serving sentences for burglary, evading arrest, and traffic violations. He had a prior conviction for aggravated assault.

Id. at *1-3.

Subsequently, the Petitioner, acting pro se, filed a petition for post-conviction relief. The post-conviction court originally dismissed the petition on the basis that it had not been properly made under oath. On appeal, this Court found that the proper remedy was to allow the Petitioner the opportunity to amend the petition. See Kenneth R. Griffin v. State, No. E2001-01932-CCA-R3-PC, 2002 WL 236697, at *3 (Tenn. Crim. App. Feb. 19, 2002). Therefore, this Court reversed the post-conviction court's dismissal of the Petitioner's original petition, remanded the case to give the Petitioner the opportunity to amend his petition, and appointed counsel to assist the Petitioner in doing so. Id. The Petitioner filed an amended petition, and a post-conviction hearing was held.

The Petitioner testified at the post-conviction hearing that he met with trial counsel and co-counsel (collectively "counsel") about "six to eight times" prior to trial. According to the Petitioner, the victim contracted with him to build a garage in exchange for roughly $26,000. The victim payed him in full through several installments made during the course of the construction, always in cash. The Petitioner hired Jamie Strickler and Ferrell Routh to assist him with the construction.

The Petitioner testified that he was away on a trip when the victim called him and left a "frantic message." According to the Petitioner, "Jamie Strickler and Ferrell Routh had told [the victim] that I had absconded with his money, that I wasn't coming back. That for a couple thousand dollars they would finish the job." The Petitioner returned home and explained to the victim that he was still planning to complete the job. At that time, the victim agreed, but he advised the Petitioner that he did not want Strickler or Routh back on his property. The next morning, the Petitioner relayed the message to Strickler and Routh. The Petitioner hired two assistants to replace Strickler and Routh and finished construction on the garage.

The Petitioner testified that on August 3, 1997, he was working on his car when "a boy came by trying to sell a bag of weed." The Petitioner did not have enough money with him to buy it, so he went to a pawn shop and pawned his saw in order to buy the marijuana. Later that afternoon, he stopped to pay his phone and cable bills. That night, he went to the victim's house to make a repair on the garage. After making the repair, he was leaving when he noticed that the security light on the garage was not working properly. He adjusted the light, left the victim's house, and headed home. According to the Petitioner, that was the last time he saw the victim. On his way home, he stopped and paid the rent.

The next day, the Petitioner testified, "[B]efore I'd left at lunch that afternoon, I – I got my money out, put my money and everything in the car." That evening, Strickler called the Petitioner and informed him that the "police were looking for [them]" because the victim had been found dead. That night, officers interviewed the Petitioner and seized his shoes. Later, officers searched his house and car and seized $14,000 from his trunk. Officers also seized the money from his pocket, including a $50 bill with a blood stain on it. The Petitioner testified that the blood on the money and on his shoe was his own. According to the Petitioner, he had cut his finger while pumping gas. He also testified that he had an abscess in his mouth that would occasionally bleed, causing him to spit out blood.

The Petitioner testified that he wears a size fifteen shoe. According to the Petitioner, his shoe print is "a minimum" of fourteen and a half inches. The Petitioner surmised that, had he testified, he could have shown the jury that his footprint was several inches longer than the roughly ten-inch long bloody shoe print discovered at the crime scene. The Petitioner also stated that one floor mat was missing from his car at the time he bought it.

The Petitioner testified that he discussed with counsel the possibility of testifying. According to the Petitioner, he told trial counsel, "If you don't put me on the stand, they're going to convict me." However, trial counsel told him, "No. No. I've got this – we've got this won. The case is won. We've won it. I'm not putting you on the stand. No." However, co-counsel agreed with the Petitioner that he should testify. According to the Petitioner, trial

counsel refused to call him to testify. The Petitioner stated that he never discussed with counsel the potential risks or benefits associated with his testifying.

The Petitioner denied ever confessing to Donald Urich that he had killed the victim, and he surmised that, had he been called to testify, he could have rebutted Urich's testimony to that effect.

The Petitioner admitted that, during the sentencing hearing following his conviction, he responded "yes" to the question: "Did you, in conjunction with your attorneys, weigh your options there and make a decision as to whether you should or should not testify?" Also during the sentencing hearing, when asked what decision he had made with regard to testifying during trial, the Petitioner responded, "not to testify."

On cross-examination, the Petitioner admitted that he had a bank account at the time of the murder, but he explained that he had been keeping all of his savings in cash because he "had went [sic] through a divorce and [he] didn't want to get the money confused with . . . the business and personal." Typically, he kept his money under his bed. He agreed that "most" of the events that he would have testified to were contained in his written statements, which were admitted as evidence at trial.

The Petitioner also admitted that his shoe was admitted as evidence during his trial. He acknowledged that the jury could have compared the size of his shoe with the size of the footprint.

Regarding his past criminal record, the Petitioner remembered, "I believe that [co-counsel] did discuss, you know, something with me about, you know, they might bring up my past record." The Petitioner admitted that he had an extensive criminal history, including twenty-two prior felonies.

The State called trial counsel to testify. Although trial counsel admitted that "[t]his trial was in 1997, and there [we]re a lot of things, details" that he could not remember, he testified, "I can state unequivocally that I did not tell [the Petitioner] that I would not put him on the witness stand. . . . I've never told any defendant that he could not testify." Trial counsel further stated, "the second thing that I can state unequivocally that I didn't tell him was that we had this case won." Rather, he testified that he had handled a "large number" of jury trials throughout his career, and he had "never known what the jury was going to do." In contrast to the Petitioner's testimony, trial counsel stated that "there was substantial albeit circumstantial evidence" in this case, and "if I'd been giving orders in a case like that it is more likely that I would have urged him to testify." Trial counsel also noted that the Petitioner "had a bad criminal record" and that "there were certainly balancing considerations

as to whether he would, should, or wouldn't testify in this case." He surmised that "there was [sic] some pluses and minuses" to the possibility of the Petitioner's testifying.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently issued an order denying relief. The Petitioner timely appealed, asserting that trial counsel was ineffective in that he failed to inform the Petitioner properly regarding his right to testify and refused to allow the Petitioner to testify.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-203 (1997). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-210(f) (1997); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[2] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable

---

[2] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

under Tennessee's Post-Conviction Procedure Act.  See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs:  (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel.  Goad, 938 S.W.2d at 370.  Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong.  Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'"  Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688).  Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance.  It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).  When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time."  Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006)  (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689).  We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result.  Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991).  We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The Petitioner contends that trial counsel's performance was deficient in that he failed to properly advise the Petitioner of his right to testify and because the Petitioner's "decision whether to testify was made by his counsel and not himself." He asserts that the absence of his testimony prejudiced the outcome of his trial. In its order denying relief, the post-conviction court credited trial counsel's testimony that he "went through the weighing process as to what could be gained or lost by placing the [P]etitioner on the witness stand" and held that the Petitioner failed to show ineffective assistance of counsel by clear and convincing evidence.

The record does not preponderate against the post-conviction court's finding. See Pylant, 263 S.W.3d at 867; Sexton, 151 S.W.3d at 531. We note that no hearing was held at the time of trial regarding the Petitioner's waiver of his right to testify. However, no such hearing was required, as the Petitioner's trial concluded in 1997, before our supreme court issued its decision in Momon v. State, 18 S.W.3d 152 (Tenn. 1999), setting out the procedural requirement of such a hearing.[3] As a result, the record contains little evidence regarding the circumstances surrounding the Petitioner's decision not to testify. The only testimony near the time of trial contained in the record regarding the Petitioner's decision not to testify is the Petitioner's own testimony during the sentencing hearing in which the following exchange occurred:

_____

[3] Indeed, in Momon, our supreme court held that the procedural requirements prescribed therein did not constitute "a new constitutional rule which must be retroactively applied" and were applicable only to cases "tried or retried after the date of this decision." Momon, 18 S.W.3d at 163; see also Almeer K. Nance v. State, No. E2008-00857-CCA-R3-PC (Tenn. Crim. App. Jan. 23, 2009) (noting that "the procedure adopted by the Tennessee Supreme Court in Momon to ensure that a defendant has personally waived his right to testify has no application" to a trial held before the holding in Momon).

-10-

[Trial Counsel]: In the guilt phase of the case, did . . . discuss with your attorneys the fact . . . a right to testify in the case at that stage if you wanted to do so?[4]

[The Petitioner]: Yes, sir, I did.

[Trial Counsel]: And did you in conjunction with your attorneys weigh your options there and make a decision as to whether you should or should not testify?

[The Petitioner]: Yes, sir, I did.

[Trial Counsel]: All right. And in the guilt phase what decision did you make in regard to whether you should testify?

[The Petitioner]: To testify.

[Trial Counsel]: In the guilt phase?

[The Petitioner]: Yes.

[Trial Counsel]: Did you testify in the guilt phase?

[The Petitioner]: No, no, no, I'm sorry.

[Trial Counsel]: What decision did you make in that regard?

[The Petitioner]: In the guilt?

[Trial Counsel]: In the guilt phase?

[The Petitioner]: The trial part was not to testify.

This testimony directly contradicts the Petitioner's testimony at the post-conviction hearing.

Trial counsel testified at the post-conviction hearing that, by the time of the post-conviction hearing, he could not recall the details of his conversation with the Petitioner about whether he should or should not testify. Indeed, he could not recall whether he advised

---

[4] Portions of this sentence were obscured in the copy of the transcript.

the Petitioner one way or the other. However, trial counsel did testify that he could "state unequivocally that [he] did not tell [the Petitioner] that I would not put him on the witness stand."

The only evidence submitted at the post-conviction hearing to the contrary was the Petitioner's own testimony that trial counsel refused to allow him to testify. The post-conviction court clearly and expressly discredited the Petitioner's testimony. In its order denying relief, the post-conviction court stated, "After hearing all the proof and reviewing all the evidence and especially considering the fact that the [P]etitioner had twenty two (22) prior felony convictions on the day of this murder trial, the Court credits the testimony of [trial counsel] and does not credit the testimony of the [P]etitioner." We will defer to the post-conviction court's findings with respect to the witness' credibility and the weight and value of his testimony. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

Based on the evidence before us, the Petitioner has failed to demonstrate by clear and convincing evidence that trial counsel failed to properly inform him regarding his right to testify or that trial counsel refused to allow him to testify. Therefore, the Petitioner has failed to establish deficient performance in this regard. Accordingly, the Petitioner is entitled to no relief on this issue.[5]

While a claim of ineffective assistance of counsel is cognizable under the Sixth Amendment, the Petitioner's assertion that trial counsel refused to allow him to testify also raises a distinct constitutional claim that he was denied his fundamental right to testify as "guaranteed both by Article 1, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution." Momon, 18 S.W.3d at 155. However, for the reasons set for above, the Petitioner has failed to establish by clear and convincing evidence that he was denied this fundamental right. The Petitioner testified during the sentencing hearing that he had discussed with counsel the possibility of his testifying at trial and that he chose not to testify. Moreover, trial counsel testified at the post-conviction hearing "unequivocally" that he did not refuse to put the Petitioner on the stand. Furthermore, the post-conviction court credited the testimony of trial counsel and discredited that of the Petitioner. Accordingly, the Petitioner is entitled to no relief on this issue.

---

[5] Because we have determined that the deficiency prong has not been satisfied, we need not address the prejudice prong on this issue. See Goad, 938 S.W.2d at 370.

-12-

**CONCLUSION**

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE